UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ALBERT TROSTEL & SONS COMPANY,

        Plaintiff,

      v.                          Case No. 07-C-0763

EDWARD U. NOTZ,
SANDRA KEEP NOTZ,

        Defendants.

DECISION AND ORDER REGARDING THE FAIR VALUE OF THE SHARES OF
ALBERT TROSTEL & SONS COMPANY FOLLOWING TRIAL TO THE COURT

        In the 1930s, Albert O. Trostel, Jr. invited his Dartmouth roommate, Everett Smith, to come work for the family leather and tannery company, Albert Trostel & Sons ("ATS"), as financial director. After Albert Jr.'s passing in 1962, Smith, his good friend and business partner, was named president of ATS, which, following World War II, had grown into a diversified global operator. Smith ran the company for more than thirty-five years, overseeing international development and the growth of ATS's subsidiaries. Upon his demise in 1997, Smith's majority ownership interest in ATS passed to the conveniently named Everett Smith Group, Ltd. ("ESG"). *See* Jeffery L. Rodengen, et. al., *The Legend of Albert Trostel & Sons* (2004).

        As discussed herein, ESG was the majority shareholder of ATS in 2007, when a decision was made to merge ATS into a wholly owned subsidiary of ESG and convert minority interests into cash. This decision, was, in part, the culmination of contentious relations with Edward U. Notz, great-grandson of ATS founder Albert Gottlieb

Trostel and a minority shareholder, who was suing ESG for, among other things, breach of fiduciary duties and dissolution related to several corporate transactions. *See Notz v. Everett Smith Group, Ltd.*, 2009 WI 30, 316 Wis. 2d 640, 764 N.W.2d 904. The board of directors concluded, among other things, that a cash-out merger could moot Notz's dissolution claim pending in state court. (*See* Ex. 64 at 4, 8.)

Wisconsin, like many states, has attempted to strike a balance between protecting minority shareholders and respecting business judgment. To that end, it has enacted a statutory scheme identifying certain rights for minority shareholders dissenting from various corporate actions, such as the merger at issue. Notz perfected his dissenter's rights after the Trostel transaction went through over his objection on May 17, 2007. Pursuant to Wisconsin law, ATS paid Notz what it estimated to be fair value for his shares plus interest. Notz disagreed with ATS's fair value determination. On August 23, 2007, ATS brought this "special proceeding" for a judicial determination of the "fair value" of the shares at the time of the merger. *See* Wis. Stat. § 180.1330. Following discovery and the resolution of several disputes between the parties, a bench trial was held on November 16-17, 2009.

The parties agree that this special proceeding is governed by Wisconsin law. This court has jurisdiction over the case pursuant to 28 U.S.C. § 1332. (*See* Order of Feb. 28, 2008 (Doc. # 26).)

## I. FACTUAL BACKGROUND

ATS is a Wisconsin corporation that has its principal place of business in Milwaukee, Wisconsin. ATS is the holding company of subsidiaries Eagle Ottawa and Trostel Ltd. Eagle Ottawa offers finished hides, cut leather parts, and seat cover

engineering services to nearly 30 automotive customers, and its products can be found in more than 100 vehicle models. It is the market leader of automotive leather interior products. It is headquartered in Auburn Hills, Michigan, and has several operating facilities in the United States and around the globe. For fiscal year 2006, Eagle Ottawa's revenues were approximately $549 million.

Trostel Ltd. is a custom manufacturer of precision rubber components and assemblies, custom seals and precision bonded moldings, precision metal stampings, and rubber compounds. It markets primarily to automotive and appliance industries. Trostel Ltd. is headquartered in Lake Geneva, Wisconsin, and has facilities in Wisconsin and Mexico. For fiscal year 2006, Trostel Ltd.'s revenues were approximately $72 million.

Defendants Edward U. Notz and Sandra Keep Notz are citizens of Illinois. Sandra Keep Notz is named solely in her capacity as Successor Trustee of the Trust under Agreement with Clara U. Trostel, dated December 24, 1938 ("the Trostel Trust"). The court refers to Edward Notz as "Notz," as he represents the defendants in this action.

On the effective date of the merger that gave rise to this action, Notz directly owned 643.6 shares of common stock of ATS and was the beneficial owner of 475 shares of the common stock of ATS held by the Trostel Trust. In all, Notz directly or beneficially owned approximately 5.5% of the outstanding shares of ATS. ESG was ATS's majority shareholder and owned approximately 88.9% of the common stock of ATS. Other minority shareholders in ATS owned approximately 5.6% of the shares.

On May 17, 2007, pursuant to a plan of merger, ATS merged with a wholly-owned subsidiary of ESG. ATS, as the surviving corporation, became a

wholly-owned subsidiary of ESG.  The plan of merger provided that the shares of common stock held by the ATS minority shareholders would be converted to cash.

The senior managers of ATS are also officers of ESG.  In preparation for the proposed merger, ATS created a Special Merger Committee ("SMC") in February 2007, comprised of its three outside directors—Walter Winding, Richard Kleinfeldt, and Wendell Bueche—who were not affiliated with ESG.  ATS's bylaws required that the merger be approved by such a committee.  The SMC retained the law firm Reinhart Boerner Van Dueren, S.C. as outside legal counsel to advise it in the process.  It also retained Duff & Phelps, LLC ("D&P"), an investment banking firm, to perform a valuation estimate of ATS and its stock for the potential cash-out merger.

From February 8, 2007, through April 18, 2007, D&P under the direction of Daniel Bayston—ATS's valuation expert in these proceedings—engaged in due diligence and applied commonly accepted valuation methodologies to determine the value of ATS as an ongoing enterprise.  During the process, D&P, among other things, reviewed more than 15,000 pages of documents and interviewed management at ESG, ATS, and ATS's subsidiary companies.

In completing due diligence, Bayston reviewed financial projections (or forecasts), which were prepared by ATS and its subsidiaries in the fall of 2006 for fiscal years 2007, 2008, and 2009.  As discussed later in this opinion, management's projections are key to the valuation methodology utilized by the experts in this case.

For background, the preparation of financial projections is part of a standard, strategic planning process performed at ATS each fall.  The process involves each subsidiary gathering and analyzing information, as well as developing a detailed budget for

the next fiscal year along with projections for the following two years. With regard to the planning process, Bob Carlo, the Chief Financial Officer of Eagle Ottawa, testified that the detailed business plan for the first year is developed from each facility and department and consolidated by Eagle Ottawa management. The second and third years are more directional, but with the goal of accurately predicting results for the business in the out years. (Tr. 356-57.) Similarly, DeWayne Egly, President and Chief Executive Officer of Trostel Ltd., testified that the goal of the budgeting and forecasting process was to produce realistic and attainable budgets.

In undertaking the strategic planning and budgeting process, Trostel Ltd.'s management would gather information on sales, costs and materials from a variety of sources. (Tr. 344-45.) Both subsidiaries then forwarded their budgets and projections to the senior management at ATS. (*See* Ex. 10.) During the course of the fiscal year, management at the subsidiaries monitored the progress of the business against the plan.

Bayston's due diligence led him to question the reliability of the fall 2006 projections. As of the first quarter for 2007, Eagle Ottawa was posting better than expected results in terms of revenue and income. (Tr. 184, 359; Exs. 11, 46.) And, in a presentation to the Eagle Ottawa board of directors on February 15, 2007, Carlo's team adjusted the projected earnings and profits for fiscal year 2007. (Ex. 46; Tr. 359.) In contrast, Trostel Ltd. was underachieving as of the first quarter, due in part to weaker sales to major customers. (Ex. 13 at 3.) This information was relayed to Trostel Ltd.'s board on February 14, 2007, by Egly. (Ex. 13 at 3; Tr. 345-46.) However, despite concerns that projected increases in revenue had not materialized, Egly informed the board that its sales forecast for 2007 remain unchanged. (Tr. 347.)

In a meeting with Trostel Ltd.'s management on March 20, 2007, Bayston expressed his concerns that the subsidiary would not meet its forecasts. (Ex. 313; Tr. 97, 347-48.) In addition, Bayston met with Eagle Ottawa's management to discuss business operations. (Tr. 361, 372.)

On March 27, 2007, Bayston met with members of ATS's senior management. (Tr. 101-02.) Prior to the meeting, Bayston notified the SMC of his intention to meet with ATS's management and expressed his belief that the meeting would be more productive if members of the SMC did not attend. (Tr. 101-02.) However, he recognized that the managers of ATS were officers of ESG, and that this may appear as a conflict. Nonetheless, the SMC members approved the meeting, and agreed that they would not attend.

After speaking with the management of ATS as well as each subsidiary, and examining the performance of the operating units, Bayston concluded that the projections prepared in the fall of 2006 did not reflect management's best estimates for business performance. (Tr. 92.) He found that Trostel Ltd. had failed to meet projected forecasts for sales and profits in recent years, and that the forecasts for 2007, 2008, and 2009 were substantially ahead of historic margins. (Tr. 112, 191; Ex. 116.) The performance reviews from the first period of the then-current fiscal year reinforced his belief that the projections were no longer accurate. (Tr. 92-94.) Conversely, Eagle Ottawa's numbers were ahead of plan for 2007, calling into question the accuracy of its projections as well. (Tr. 100.)

On March 28, 2007, Bayston met with the SMC and explained his belief that the projections prepared in the fall of 2006, no longer reflected management's current

thinking or current expectations for future results. (Ex. 18; Tr. 114.[1]) He noted that ATS's management indicated that the initial projections were not developed as the most likely reasonable scenarios, but reflected financial goals for achieving current business milestones that may not be reasonably expected. (Ex. 21.) He explained that it would be difficult to provide a proper value estimate for the company using these projections, and that it would be appropriate for the company to provide a more current and accurate set of projections. The SMC agreed with Bayston that new projections should be obtained from management. (Ex. 18.)

On March 29, 2007, Bayston sent an email to Bruce Betters, Assistant Chief Financial Officer for ATS, and Steven Hartung, Chief Legal Officer for ATS, explaining his concerns with the fall 2006 projections and requesting new forecasts "prepared in good faith on assumptions that reflect a reasonable expectation of the businesses." (Ex. 319.) He further requested written commentary from management "explaining the major assumptions behind the forecasts and the reasons for the expected changes from current performance." (*Id.*) Copied on the email were members of the SMC and the SMC's legal counsel. (Ex. 319; Tr. 213.)

In response to Bayston's request, Eagle Ottawa's CEO Jerry Sumpter and CFO Bob Carlo submitted a memorandum dated April 2, 2007, to ATS's senior management discussing Eagle Ottawa's strategic plans. (Ex. 22.) Included was a revised forecast for 2007 reflecting increased revenue and earnings from the first quarter—the same figures had been presented to the Eagle Ottawa board at the first quarter meeting

---

[1] Bayston summarized these thoughts in a memorandum to the SMC dated March 29, 2007. (Ex. 21.)

of February 15, 2007. (Exs. 22, 46; Tr. 277.) Consequently, Eagle Ottawa revised its initial sales for 2007 up 4.22%. As for earnings before interest and taxes ("EBIT"), Eagle Ottawa revised its initial projections up 16.35%. The increased performance in 2007 was in part driven by market gains by Toyota and Honda, two of Eagle Ottawa's largest customers. (Tr. 185-87; Ex. 300 at 9, 22.) However, Eagle Ottawa declined to revise its forecasts for 2008 and 2009, which were, according to Bayston, already projecting "significant improvement" in the profitability of the company. (Tr. 226-27; Ex. 22.) For instance, Eagle Ottawa's initial forecasts for EBIT rose from $8,707,000 in 2007 to $27,703,000 in 2009. (Exs. 22, 92, 1001; Tr. 226-27.) The memorandum included a detailed discussion of issues Eagle Ottawa believed may impact its longer-term forecasts. Bayston had a follow up conversation with Eagle Ottawa's management regarding the information in the memorandum. (Tr. 121.)

In response to Bayston's request for updated numbers, Trostel Ltd. submitted to ATS's management revised forecasts for 2007, 2008, and 2009, all of which went down. (Tr. 121; Ex. 92.) The initial forecasts had sales increasing from 2007 through 2009. The revised forecasts still had sales increasing each year; however, the new estimates differed from the initial forecasts by -9.58% for 2007, -10.19% for 2008, and -12.50% for 2009. (Exs. 92, 1001.) Likewise, EBIT figures were revised significantly downward by -74.87% for 2007, -50.14% for 2008, and -50.01% for 2009. (Exs. 92, 1001.)

On April 2, 2007, ATS's senior management provided Bayston with the revised forecasts for ATS on a consolidated basis, as well individual revised forecasts for Eagle Ottawa and Trostel Ltd. (Ex. 92.) In preparing the consolidated revised forecasts, ATS's management did not adjust the information prepared by the subsidiaries. (Tr. 278.)

In his valuation analysis, Bayston incorporated the new information provided by ATS, including the revised forecasts for 2007, 2008, and 2009, with some minor modifications based on data received prior to the issuance of those projections. (Tr. 122-23.[2]) Thereafter, Bayston and his team met with the SMC and went through the valuation methodologies, assumptions, and conclusions. ATS's senior management was provided a draft of the valuation report for comments. (Tr. 144-45.) According to Bayston, the comments received from ATS's senior management caused him to increase the per-share value estimate in his final report. Applying commonly accepted valuation methodologies to determine the value of ATS as an ongoing enterprise, Bayston concluded that the fair value of ATS's common stock was $11,900 per share. (*See* Ex. 300.) D&P, at the direction of the SMC, prepared an opinion as to the fairness, from a financial perspective, of the proposed merger on minority shareholders. (Exs. 300, 304.) This process involved a fairness review committee consisting of two D&P managing directors, who reviewed the analyses performed by Bayston's team. (Tr. 142.) Ultimately, the "fairness opinion" provided by D&P concluded that the proposed merger was, from a financial perspective, fair to ATS's minority shareholders. (Ex. 300.)

On April 18, 2007, Bayston and his team presented their final findings and conclusions to the SMC. (Tr. 142; Ex. 300.) Unanimously, the SMC accepted D&P's valuation report.

On April 25, 2007, the SMC recommended that the merger be completed with the per-share merger consideration equal to the value determined by D&P, namely

---

[2] The minor modifications related to lease income and pension plan expenses that had been otherwise accounted for in Bayston's analysis and thus inclusion would have resulted in double-counting.

$11,900 per share.  That same day, ATS's board of directors approved and adopted the agreement and plan of merger, determining that the merger was fair and in the best interests of ATS and its shareholders.  In addition, the ATS board recommended that shareholders approve the agreement and plan of merger.  The duly authorized agreement and plan of merger provided that the shares of common stock held by the minority shareholders of ATS be converted into cash.

On April 26, 2007, ATS provided the minority shareholders, including Notz, with an "Information Statement for Special Meeting of Shareholders to be Held on May 17, 2007."  With the Information Statement were: (a) an executed copy of the Agreement and Plan of Merger; (b) the bylaws of ATS; (c) the ATS Rules for Annual Meeting of Shareholders, which would govern the meeting at which approval of the merger would be voted on; (d) financial statements; (e) a complete copy of the April 18, 2007, Valuation Analysis prepared by D&P; (f) the April 25, 2007, Fairness Opinion of D&P; and (g) a copy of the Wisconsin Statutes concerning dissenters' rights, namely Wis. Stat. §§ 180.130-180.1331.

At the special shareholders' meeting of May 17, 2007, only the shares owned directly or beneficially by Notz were voted against the merger.  Consummation of the agreement and plan of merger was a corporate action giving rise to the "dissenter's rights" provisions of Wisconsin law, Wis. Stat. ch. 180, and the defendants timely exercised their statutory rights to dissent from the merger and to obtain payment for the fair value of their shares.  *See* Wis. Stat. § 180.1302.  On June 25, 2007, ATS paid the defendants a sum equal to $11,900 per share with accrued interest from May 17, 2007, to that date, for a total amount of $13,401,844.48.  *See* Wis. Stat. § 180.1325.

In connection with the cash-out merger, Notz retained Navigant Consulting to provide a preliminary estimate of the fair value of ATS stock. (Tr. 449; Ex. 65 at 4.) David Giesen, a director of valuation services at Navigant and Notz's valuation expert in this case, was tasked in July 2007 with performing the initial valuation analysis. At the time he was retained, Giesen had access to audited financial statements, background information on ATS, D&P's valuation analysis, and the Information Statement provided to Notz by ATS. (Tr. 450-51.)

On July 24, 2007, Giesen presented his preliminary valuation estimate to Notz. (Ex. 65; Tr. 456.) Based on his review of the information available at that time, and applying commonly accepted valuation methodologies, Giesen estimated the per-share valuation to be between $14,370 and $16,773. (Ex. 65 at 5.) Giesen's preliminary valuation report highlights that the most critical variable was selling, general, and administrative ("SG&A") expenses, which increased between 2001 and 2006 at a rate substantially ahead of revenue growth and the Consumer Price Index or Producer Price Index. (Ex. 65 at 5.) Given the questions regarding SG&A expenses, Giesen developed an alternative model assuming a $20 million reduction on a pretax basis in SG&A expenses. This model derived a fair value of equity per share range of $19,862 to $22,804, with a midpoint of $21,578. (Ex. 65 at 10.)

On July 25, 2007, Notz notified ATS that he believed the fair value of his interest to be $21,578 per share. Consistent with that figure, he demanded an additional $10,826,449.55, plus interest. *See* Wis. Stat. § 180.1328. On August 23, 2007, ATS initiated this action pursuant to Wis. Stat. § 180.1330(1) for a determination of the "fair value" of the defendants' ATS shares.

The parties agree that all conditions precedent to the commencement of an appraisal action under Wisconsin law have been met. Shortly before trial, Notz made it known that he now believes the fair value of his shares to be $13,733 per share—a substantial departure from the $21,578 per share he requested in 2007.

## II. LEGAL FRAMEWORK

This action is governed by Wisconsin law, and the court must apply substantive law as declared by the state's legislature or highest court. *See Home Valu, Inc. v. Pep Boys-Manny, Moe and Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000). If Wisconsin law is unclear, this court must predict how the Supreme Court of Wisconsin would decide the question. *Rodman Indus., Inc. v. G & S Mill, Inc.*, 145 F.3d 940, 942 (7th Cir. 1998). With respect to fair value appraisal proceedings, Wisconsin case law is a bit thin. Hence, the parties cite to several Delaware cases inasmuch as Delaware is "a jurisdiction to which Wisconsin courts often look for 'guidance on corporate law.'" *Notz*, 2009 WI 30, ¶ 35.

In the event a minority shareholder dissents from a fundamental corporate transaction, Wisconsin law sets forth the procedure by which the minority shareholder can compel the corporation to purchase his shares. *See Kademian v. Ladish Co.*, 792 F.2d 614, 629 (7th Cir. 1986). "If the shareholder expresses dissatisfaction with the payment of shares offered by the corporate entity and complies with the appropriate procedures, a corporation may institute a special proceeding and petition the court to make a binding determination as to the fair value of the shares." *HMO-W Inc. v. SSM Health Care Sys.*,

2000 WI 46, ¶ 18, 234 Wis. 2d 707, ¶ 18, 611 N.W.2d 250, ¶ 18 (citing Wis. Stat. §§ 180.1328, 180.1330, and 180.1302(1)).

"Fair value," in turn, "means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects," Wis Stat. § 180.1301(4), which in this case is the May 17, 2007, cash-out merger. "[T]he focus of fair valuation is not the stock as a commodity but rather the stock only as it represents a proportionate part of the enterprise as a whole." *HMO-W, Inc.*, 2000 WI 46, ¶ 31. The underlying assumption is that the minority shareholder intended to maintain his investment had the disputed corporate action not taken place. *Id.* ¶ 27-29 (citing *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989)). "Fair value," as defined by Wisconsin law, does not reflect any discount for minority interest or lack of marketability. *See id.* ¶ 30.

"In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520-21 (Del. Supr. 1999). The court is permitted to select one of the parties' valuation models as its general framework, or fashion its own, to determine fair value in the appraisal proceeding. *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. Super. Ct. 1996). The court is "not required to accept any one party's represented valuation." *HMO-W Inc.*, 2000 WI 46, ¶ 59 (citing Wis. Stat. §§ 180.1301(4), 180.1330(1)).

### III.  THE APPRAISALS

As appears common in these types of proceedings, the parties rely on the analyses of their valuation experts in support of the positions. Notz, of course, believes the

corporation to be worth more than the $11,900 per share paid out by ATS, and he presented expert opinion testimony to that end.

Notz's expert, David Giesen of Navigant Consulting, has a bachelor of arts degree from Marquette University and a masters of business administration degree from Loyola University of Chicago. Giesen has more than 25-years experience in financial services and business valuations, though he does not have specific expertise in performing valuations of companies in the automotive industry. (Tr. 508.) In preparing his report, Giesen and his team at Navigant considered D&P's valuation report, the Information Statement provided by ATS, various board minutes, and other financial reports. (*See* Ex. 81; Tr. 460.) Giesen also attended several depositions and reviewed the deposition transcripts of members of ATS's management team. (Tr. 460.) Giesen's report of August 25, 2009, does not incorporate his preliminary valuation which was provided to Notz on July 24, 2007. (*See* Ex. 81.)

ATS's expert, Daniel Bayston, is a former managing director of D&P, as well as director of D&P's efforts in preparing the valuation report and fairness opinion for the SMC. He has a bachelor of science degree in finance from the University of Illinois, and a masters of business administration degree from the Kellogg Graduate School at Northwestern University. Bayston has more than 25-years experience in financial services and business valuations. He testified that his expertise is providing valuation opinions on non-publicly traded securities, and that he has substantial experience doing so for companies in the automotive field. (Tr. 59-60.)

Bayston's report was issued June 15, 2009. In this report, he reaffirms and incorporates the work that he and his former team at D&P performed while preparing the

valuation analysis of ATS issued on April 18, 2007, and fairness opinion issued on April 25, 2007. (*See* Ex. 300.) The parties agree that Bayston and Giesen are qualified to provide expert opinion testimony pursuant to the Federal Rules of Evidence.

Both experts employed commonly-accepted valuation methodologies: (1) the discounted cash flow ("DCF") method, and (2) the comparable public company ("comparable company") method. Averaging the results derived from their DCF and comparable company approaches, each determined an enterprise value range. Next, they applied the same adjustments to the enterprise value range by adding cash and non-operating asset/liabilities and subtracting debt and an unfunded pension obligation to arrive at a fair value of equity range. (Exs. 81 & 300.) Both experts selected the midpoint of their respective value ranges, and divided that midpoint value by the number of outstanding shares to reach their "selected fair value of equity per share."

Bayston arrived at a fair value of equity range of $228.1 million to $268.1 million, with a midpoint of $243.1 million, and a per-share value midpoint of $11,900. Giesen arrived at a fair value of equity range of $262.1 million to $299.1 million, with a midpoint of $280.1 million, and a per-share value midpoint of $13,733. The difference between the two midpoints is relatively small as far as these cases go—approximately 15%.[3] *See e.g.,* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 619 (1998) (noting that "[i]t is not unusual for the opinions of the experts to differ by a factor of ten," and citing cases). Nonetheless,

---

[3] As such, one might reason that the parties could foresee litigation expenses (in terms of money, time, and stress) nearly eclipsing the financial differences, and thus attempt to resolve the dispute short of trial. Such is not the case here, however, where the evident frustrations of the parties appeared to make trial the exclusive avenue to resolution.

the amounts in dispute, including attorneys fees and expenses (as discussed later), are significant.

Which brings the court to the fair value determination (or, more appropriately, estimation). The parties agree that the valuation methodologies employed by their experts are appropriate and commonly accepted, and this court has no reason to reject those methodologies as the starting point. Moreover, the experts agree on many of the factors and assumptions going into their analyses, and both selected a value of equity per share by averaging the results of the two techniques employed.

The points of dispute in each expert's report have been identified and challenged thoroughly. The court's role includes determining the soundness of the parties' positions as to each dispute based on the evidence submitted, and the credibility of the witnesses. However, as one district court judge remarked, "I do not have a roving commission to make an ideal determination of . . . fair value. Instead, I am bound by the record that the parties have presented me and the inadequacies it contains." *Kaplan v. First Hartford Corp.*, 603 F. Supp. 2d 195, 198 (D. Me. 2009); *see also Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, *8 (Del. Ch. Oct. 19, 1990) ("An appraisal action is a judicial, not an inquisitorial, proceeding. The parties, not the court, establish the record and the court is limited by the record created. The statutory command to determine fair value is a command to do so in a judicial proceeding, with the powers and constraints such a proceeding entails.").

Here, the court has considered all of the evidence, including the methodologies, assumptions, and figures used by the experts in reaching their conclusions. Therefore, the court finds that a preponderance of the evidence shows that the valuation

methodology used by ATS was correct and should be adopted by the court.  In addition to the reasoning set forth below, several overarching factors are worth noting.  The court rejects Notz's attacks on Bayston's independence and the conduct of the SMC.  The record does not support the contention that ATS, through Bayston and SMC, engaged in efforts to drive down the valuation estimate of ATS.  To the contrary, the record shows that the appraisal process engaged by ATS, and directed by Bayston, was comprehensive and vetted thoroughly.  Thus, the proper focus is on the work of the experts.

Valuation is an art, and Bayston's specific experience analyzing companies associated with the automotive industry is notable inasmuch as the volatile nature of the industry, and corresponding risks and opportunities, must influence the myriad assumptions required in the DCF and comparable company approaches.  Giesen, though certainly qualified and experienced in business valuations, has no experience analyzing companies associated with the automotive industry.  (*See* Ex. 81; Tr. 507-08.)  With that background, the court addresses the experts' approaches, and the disputed matters identified by the parties.

A.  Discounted Cash Flow Analyses

Of the two analyses employed by the experts, the greatest difference appears in the results of the DCF analyses, wherein Bayston determined a midpoint value of $178.5 million and Giesen determined a midpoint value of $230.7 million.  (Exs. 81, 300.)

The DCF model includes three basic components: (1) estimation of net cash flows that the firm will generate and when, over some period; (2) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and (3) the cost of capital with which to discount to a

present value the projected net cash flows and the estimated terminal or residual value. *See Cede & Co.,* 1990 WL 161084, at *7.  Though a very common and highly regarded valuation methodology, the DCF technique is dependant on guesswork and subjectivity. *See e.g.*, Wertheimer, *supra*, at 630-31.  "As a practical matter, appraisal cases frequently center around the credibility and weight to be accorded the various projections for the DCF analysis."  *Crescent/Mach I Partnership, L.P. v. Turner*, 2007 WL 1342263, *9 (Del. Ch. May 2, 2007).

While the experts employed similar methodologies and assumptions, they identified four material issues: the use of management's forecasts; estimates on SG&A expenses; assumptions on capital expenditures compared to depreciation in the terminal period; and the appropriate discount rate.  These disputes are explored in the experts reports, and consumed much of the testimony at trial.  They are addressed in turn.

1.  Estimating Future Cash Flows and Management's Forecasts

A DCF approach requires the creation of a financial forecast that projects a company's future revenues and expenses.  *Gilbert v. MPM Enters., Inc.* 709 A.2d 663, 668 (Del. Ch. 1997).  Typically, valuation experts will use forecasts prepared by management, and apply assumptions extending the forecasts over a period of time.  Here, the primary disagreement between the parties with regard to the DCF analyses lies in the choice of forecasts for 2007, 2008, and 2009, prepared by the management of ATS.  Bayston used the company's revised forecasts that management compiled in April 2007 (referred to as the "spring 2007 forecasts").  Giesen, on the other hand, used the forecasts prepared by management in the fall of 2006 (the "fall 2006 forecasts"). Both experts agree those forecasts of the company's future performance are key to a proper DCF analysis.

The parties concur that the most appropriate forecasts for use in a DCF analysis are those that reflect management's best estimates of future performance. And, it is generally true that management's projections prepared in the ordinary course of business are preferable to those prepared for purposes of litigation. *See Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, *7 (Del. Ch. July 9, 2003), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005) ("Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body."); *see also Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, *5 (Del. Ch. May 20, 2004) ("'Inputs in a discounted cash flow are predictions which are necessarily speculative in nature. The quality of these predictions is therefore central to the reliability of the underlying methodology.'" (quoting *Harris v. Rapid Am. Corp.*, 1990 WL 146488, *6 (Del. Ch. Oct. 2, 1990))).

With that in mind, Notz contends that ATS's fall projections are the most reliable because they are the most recent projections developed in the ordinary course of business. The spring projections, in contrast, were, according to Notz, completed in haste, on an ad hoc basis, with a likely bias in favor of reducing the ultimate per-share value estimate. Notz argues that unlike the months-long strategic planning process used to formulate the fall 2006 forecasts, the spring 2007 forecasts were prepared and submitted on four days notice—the request for revised figures was issued to the subsidiaries on March 29, 2007, and ATS relayed the consolidated revised forecasts to Bayston on April 2, 2007.

As evidence of bias, Notz points to Bayston's memorandum requesting revised forecasts focusing on the weak results of Trostel Ltd. which "clearly conveyed the message that Bayston expected a downward adjustment."  (Notz Trial Br. 10.) Correspondingly, Trostel Ltd. revised its forecasts for 2007, 2008, and 2009 downward, while Eagle Ottawa, the substantially larger subsidiary performing well ahead of plan, revised only its 2007 figures while leaving the out years untouched.

The record, however, supports Bayston's contention that the spring 2007 forecast appropriately reflects management's then-current view of the business in terms of finances and operations, and provides the best estimate and expectations for the business going forward.  Moreover, the record undercuts Notz's argument that the revised projections are unreliable because they were prepared in haste.  For instance, Eagle Ottawa's revised forecasts reflected the adjustments presented to its board of directors on February 15, 2007.  Carlo testified that the adjustments made after the first quarter were prepared in the ordinary course of business and unconnected to the valuation work of D&P.  (Tr. 371.)  In preparing the revised forecasts in response to D&P's request, Carlo was directed only to come up with the best financial projections of business performance. (Tr. 373-75.)  Carlo did not foresee adjustments in the industry or in the business so as to warrant changing out year projections, and the difference between actual results and that point and the plan was insignificant.  (Tr. 375.)

As for Trostel Ltd., the record indicates that management was gathering information from customers and sales staff continually and that developments in early 2007 indicated that the company would perform well below the plan.  ATS's (and ESG's) Chief Financial Officer James Orth testified that Trostel Ltd. had previously reached an

agreement with its second largest customer for a 30% price increase. This had the potential to increase base profitability of the business "dramatically." (Tr. 338.) However, shortly after the agreement was reached, that customer closed several of its operations and filed for bankruptcy. The portion of the bankrupt business that dealt with Trostel Ltd. was sold and the price increase never materialized. (Tr. 339.)

Relatedly, Trostel Ltd.'s largest customer had recently acquired a former competitor, and indicated that it was moving to a common platform that would increase purchases of soft gaskets and seals from Trostel Ltd. dramatically. (Tr. 341.) This anticipated gain was factored into the 2007 plan; however, for myriad reasons, it did not come to fruition. (Tr. 342.) Commenting on the fiscal status of Trostel Ltd., Egly stated in a March 26, 2007, email to ATS's President Douglas Gray that "period four will be yet another disaster" and that "the year that looked like a slam du[n]k just five months ago now just looks like a slam." (Tr. 98-99; Ex. 20; *see also* Tr. 410-13; Ex. 114.) Egly added that "there is some relief coming in the second half," by which he meant the automotive industry may pick up generally, but he was "not willing to bet on it right now." (Tr. 349; Ex. 20.) By late March, when revised forecasts were requested, Trostel Ltd. was "probably 25% below plan in revenues and 100% below plan in profitability," according to Orth. (Tr. 342.)

Testimony further indicates that periodic adjustments to the plan and forecasts are part of the ordinary course of business. Timothy Baker, Trostel Ltd.'s Vice President and Chief Financial Officer, testified that by early March 2007, prior to D&P's request for revised forecasts, Trostel Ltd. envisioned a revised plan and forecast for purposes of managing the business, creating staffing plans, purchasing raw materials, and related matters. (Tr. 413-414, 419.) Baker met with D&P on March 20, 2007, and

indicated that he was undertaking efforts to prepare updated forecasts to reflect the current assessment. (Ex. 313; Tr. 418-19.) He wanted the revised forecasts prepared prior to March 30, 2007, as he was scheduled to leave for China around that date. (Tr. 415.)

Finally, though Eagle Ottawa's and Trostel Ltd.'s management may have known that the revised forecasts would be used as part of a valuation analysis for the cash-out merger, the record reveals no indication that such knowledge contributed to inaccurate results. (*See* Tr. 373, 419-20.) *Cf., e.g., Agranoff v. Miller*, 791 A.2d 880, 891 (Del. Ch. 2001) (rejecting appraisals where valuators adjusted the pre-merger projections based on post-merger discussions with managers who knew the actual results for years "projected"). Notz's speculation on this point is without support.

### 2. SG&A Expenses

In forecasting future cash flows, the experts included assumptions regarding ATS's SG&A expenses. ATS's management projected slow growth in SG&A expenses as a percentage of sales for 2007, 2008, and 2009 at 13.1%, 13.3%, and 12.6%, respectively. (Ex. 128.) Bayston and Giesen adopted these projections for their models but differ regarding subsequent periods. Starting in 2010, Bayston projected SG&A expenses increasing 3% annually. This assumption was based on inflationary trends and anticipated growth rates. (Tr. 130, 156.) These projections for SG&A expenses were above historical five and ten year averages, which as a percentage of sales were around 10%. (Ex. 128.[4])

Giesen, in contrast, assumed ATS would engage in "cost avoidance" in SG&A expenses to increase revenue. Cost avoidance, according to Giesen could include

---

[4] Between 1996 and 2006, SG&A expenses averaged 9.4% of sales, and the five year average was 10.2%. (Ex. 128; Tr. 476-77.)

"any cutbacks, lowered executive compensation and bonuses and/or inflationary increases." (Ex. 81 at 14.) Giesen opines that "a need for increased return and the volatility of the automotive and capital goods markets suggests at least some cost containment would be a likely corporate response to extremely slow forecasted revenue increases and decreasing revenue in fiscal 2007." (Ex. 81 at 11.) Through cost containment, Giesen projects SG&A expenses to decrease from management's 2009 estimate and level out at 11.5% of sales based historical norms, which assume a 3% to 4% annual rise depending on revenue growth. (Ex. 81 at 12, 22; Tr. 478.) Giesen points out that ATS is accustomed to such cost containment, having recently moved leather sourcing and production overseas and opened facilities in Argentina, Mexico, China, and South Africa. (Ex. 81 at 11; Tr. 477-78.)

However, as pointed out by Bayston, the strong performance that ATS was projected to achieve in 2009 undermines the contention that the company would (or could) engage in further cost containment in SG&A expenses going forward. (Ex. 123 at 12; Ex. 128; Tr. 157-58.) For instance, earnings before interest, taxes, depreciation, amortization ("EBITDA") were estimated in 2009 to be well above the previous five- and ten-year averages. (Ex. 128.) As noted, both experts adopted management's 2009 forecast for SG&A expenses as a basis for their out year projections.

The goal of efficiency is constant, but it must be balanced against reasonable costs of operation. And it appears that recent corporate actions, such as moving operations overseas—which were cost containment actions—result in *increased* SG&A expenses going forward as part of an overall plan for revenue growth. (*See* Tr. 524-25.) Such actions provide context for management's 2007-2009 projections, and justify using

the 2009 numbers as a base for projecting an annual increase consistent with inflationary trends. Giesen assumes additional reductions in SG&A expenses along with increased business performance, but admits that he has not analyzed specific SG&A expenses that should or could be reduced and does not disagree that ATS's increased global footprint creates additional SG&A expenses that may exceed historical norms. (Tr. 509, 523, 540.)

### 3. Capital Expenditures and Depreciation in the Terminal Period

The next area of disagreement between the parties concerns the terminal period calculation. Both experts assume that ATS's net sales will continue to grow at 3% per year into perpetuity, as will the gross profit margin of 17%. (Ex. 81 at 22; Ex. 300; Tr. 552.) However, Bayston assumes capital expenditures of approximately 109% of depreciation. (Ex. 123 at 8.) This follows from his analysis of ATS's history of reinvestment, trends of comparable companies, and a belief that capital expenditures must outpace depreciation if the company intends to manufacture the number of units necessary to achieve terminal value revenue assumptions. (Ex. 123 at 8.) Further, Bayston assumes a continual 3% price erosion, requiring 6% volume growth to generate 3% revenue growth, which demands additional investment capital. (Tr. 124-25, 153; Ex. 123 at 9.)

On the other hand, Giesen assumes that capital expenditures will equal depreciation in the terminal period. (Ex. 81 at 17; Tr. 484.) This indicates that the business would reinvest in existing business lines and services. (Ex. 81 at 17.) According to Bayston, Giesen's analysis is flawed because it implicitly assumes revenue growth without additional investment in ATS's asset base. (Tr. 240; Ex. 123 at 9.) Giesen responds that with assumptions of 17% on gross profit margin and 3% revenue growth (accepted by both experts), this is a "steady state" business that will grow at the rate of

inflation. (Tr. 485.) Commenting on Bayston's analysis, Giesen asserts that, in his professional opinion, if the gross profit margin is steady despite a reduction of unit revenue, unit costs must go down. (Tr. 485.)

The record on this point of dispute is thin. Nonetheless, the record supports Bayston's conclusion that pricing pressure has been a historical factor in ATS's performance, and is not likely to subside in the future. (*See* Ex. 317; Tr. 124-25.) Orth testified that based on his experience in the automotive industry and with ATS, a company must take into consideration certain losses due to price erosion coupled with higher production to maintain revenue levels. (Tr. 330.) ATS's subsidiaries built these factors into their business plans. (Ex. 317; Tr. 106, 330, 523.) Such pricing pressures have been constant for 20 years according to Orth, and will increase with time. (Tr. 330.) With that background, Bayston's assumption that ATS will experience 6% volume growth and 3% revenue growth appears more reasonable than Giesen's for the terminal period. This indicates additional investment in the asset base is necessary at a level consistent with Bayston's analysis.

### 4. Discount Rate

The final source of disagreement with regard to the DCF analyses rests in the differing discount rates. Bayston applies a discount rate of 10.4% (midpoint of 9.9% to 10.9%), while Giesen applies a slightly lower discount rate of 10.0% (rounded). (Ex. 300 Appx. D-4; Ex. 123 at 9; Ex. 81 at 25; Tr. 480.) Bayston and Giesen follow similar methodologies to determine the discount rate based on a weighted average cost of capital ("WACC"), which is calculated from weighted estimations of the cost of equity and cost of debt. (Ex. 81 at 24; Ex. 123 at 10; Tr. 155.) Here, the experts used comparable estimates

for the cost of equity, but differ in the estimated cost of debt. (Tr. 155; Ex. 123.) The parties target the source of the difference in the estimated cost of debt as the benchmark used by each expert.

Bayston assumed a cost of debt using the rate on the 20-year BB (or "double B") industrial bond at 7.5%. (Ex. 300 at 49; Ex. 123 at 10.) Giesen, on the other hand, uses a Baa (or "B-double-a" or "BBB") medium to long-term corporate bond rate at 6.37%. (Ex. 81 at 24.) Ultimately, the dispute over the appropriate benchmark appears moot inasmuch as Giesen rounded his WACC figure from 9.6% to the nearest whole number of 10%, and rounding the BB benchmark would have resulted in the 10% figure as well. (Tr. 483.)

Giesen testified that he selected the Baa benchmark based in large part on his assessment of ATS's debt as a percentage of total capital, which was about 6%. (Tr. 480-81.) With due regard for the comparable group of companies, which maintained a debt to capital ratio of 35% to 40%, Giesen believes that ATS's debt level would earn a more favorable bond rating. (Tr. 481.)

Bayston, on the other hand, contends that a BB rating is the appropriate benchmark for ATS based on his review of financial profiles of companies classified in the motor vehicle parts and accessories, leather and leather products, and rubber and plastics industries. (Ex. 123 at 10; Ex. 126.) Bayston utilized a statistical analysis of companies in these relevant industries, which included credit ratings. (Ex. 126; Tr. 136-37.) He focused on those companies classified as low cap and micro cap, which were in his view more comparable to ATS in terms of size and would be viewed similarly in terms of risk from a credit rating perspective. (Tr. 138.) Of the thirteen low- and micro-cap companies

that were rated, all but one were rated BB or lower.  (Ex. 126.[5])  Though Bayston agrees

that ATS's lower debt-to-capital ratio is favorable for credit rating purposes, he contends

that the primary factor for an assessment of financial risk is ATS's significant exposure to

the automotive industry, and in particular, Eagle Ottawa's heavy reliance on a few major

customers.  (Tr. 138-39.)

Bayston brandishes his 25 years of experience as a valuation expert focusing

on the automotive industry, and his experience advising a major credit rating company, in

support of his opinion on this point.  On cross examination, Giesen conceded that his

experience is not in the automotive sector, that he did not rely on an analysis of

comparable companies, and that he did not rest his opinion on information specific to the

automotive sector.  (Tr. 512-13.)  Giesen notes rightly, that the selection of the appropriate

benchmark is a judgment call based on the experts' knowledge and experience.  (Tr. 483.)

In this case, the record provides more support for Bayston's judgment call.

In addition to professional experience, the statistical reports relied on by Bayston provide

context for selecting the appropriate benchmark.  On the other hand, Giesen's conclusion

lacks such support and, though reasonable, must be discounted.

As noted, the experts indicate that they used sufficiently similar estimates in

calculating the cost of equity, and the court's review of the experts' reports affirms this

---

[5] Notz pointed out during cross examination that Bayston's rebuttal report fails to disclose that his contention that "of the [13] companies that had a credit rating, only one company had a rating of BBB," was limited to low-cap and micro-cap companies.  (Tr. 242-43.)  Of all of the companies included in the statistical analysis utilized by Bayston (adding in large cap and mid cap), four companies hold BBB or better ratings, with three rated A or above.  (Ex. 126.)  This omission, while significant, does not render Bayston's analysis faulty, and Notz does not appear to challenge Bayston's focus on the smaller companies.

conclusion.[6]  Moreover, the parties limit their dispute respecting the appropriate discount rate to the selection of the benchmark in calculating the cost of debt.  Upon the court's review of the analyses, there is no basis for altering the methodology or inputs for which there is agreement.  With that, the court accepts Bayston's calculation of the discount rate.

## B.  Comparable Company Approach[7]

As for the comparable company analyses, Bayston arrived at an enterprise value range of $181,000,000 to $220,000,000, with a midpoint of $200.5 million.  Giesen arrived at an enterprise value range of $202,679,000 to $244,792,000, with a midpoint value of $223,735,000 million.  For the reasons discussed below, the court concludes that while neither expert's analysis is unreasonable, only Bayston's analysis finds sufficient support in the record.

"The comparable companies method of valuation determines the equity value of the company by: (1) identifying comparable publicly traded companies; (2) deriving appropriate valuation multiples from the comparable companies; (3) adjusting those multiples to account for the differences from the company being valued and the comparables; and (4) applying those multiples to the revenues, earnings, or other values for the company being valued."  *Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001).

---

[6] For instance, the reports indicate identical or sufficiently similar inputs such as market risk premium, risk free rate, selected beta coefficient/system risk, and adjustment based on small size of company.  (Ex. 81 at 23-25; Ex. 300 at 48-49.)

[7] The court has also considered Bayston's Mergers and Acquisitions (M&A) analysis, which was part of the D&P valuation of ATS.  The record indicates that this analysis was of little value to Bayston, and did not materially impact the primary valuation methodologies the experts rely on in this proceeding. Therefore, the court places no reliance on that analysis.

Here, the primary disputes between the parties concern identifying the comparable group of companies, and the selection and application of the appropriate multiples.

The experts agree that many of the companies most comparable to ATS are not publically traded or are components of public companies, and thus cannot be included in such an analysis.  (*See* Ex. 300 at 32.)  And initially, they independently selected the same ten companies as potentially comparable to ATS inasmuch as these companies manufacture automotive components, particularly leather and rubber components.  (Ex. 300 at 33; Tr. 490-91.)  However, Giesen reduced his group to seven after determining that the largest three companies in terms of size and scope—Magna International, Tokai Rubber Industries, and TRW Automotive Holdings—were not truly comparable.  (Tr. 492; Ex. 81 at 18.)

From their comparable groups, the experts ascertained different enterprise value multiples applicable to four metrics: last twelve months ("LTM") revenues, LTM EBITDA, projected 2007 EBITDA, and projected 2008 EBITDA.  The experts arrived at their multiples through differing strategies.  Giesen, utilizing the smaller group in making his calculations, arranged the resulting valuation multiples according to the minimum, first quartile, average, median, and maximum.  He determined that ATS was a "first quartile" company, and selected the first quartile multiple for each metric as applicable to ATS.

Bayston, on the other hand, using the larger group, derived ranges of multiples for each metric by applying a size adjustment based on several factors.  Each expert then applied his selected multiples for each metric to measures of ATS's performance.  While Giesen and Bayston used the same historical data for ATS's LTM revenue and LTM EBITDA, Bayston used ATS's revised forecasts in calculating projected

2007 and 2008 EBITDA, while Giesen used management's initial forecasts. The resulting indicated values for each metric were averaged by the experts to arrive at their selected enterprise value.

As explained herein, both experts reviewed historical financial performance, expected future performance, the size of the businesses, specific business risks along with opportunities and related factors in analyzing the comparable companies. Bayston acknowledged that companies such as Magna and TRW were much larger than ATS in terms of revenue and assets. However, he determined that their exposure to the automotive industry provides insight on how the market values such companies. (Tr. 74-75.) With that, Bayston concluded that inclusion of these companies in the group provides more reliable results, which outweigh concerns about size.

Under Bayston's analysis with the 10 comparable public companies, ATS was smaller than the group, generating $621.1 million in LTM revenue compared to a comparable company median of $770 million. (Ex. 300 at 34-35.) Also, ATS had an adjusted LTM EBITDA margin of 5.9%, which was below the comparable company median of 7.6%. Additionally, ATS's three-year average EBITDA margin, 6.6%, was below that of the median comparable company margin, 8.8%. (Ex. 300 at 36.) LTM revenue growth for ATS was 4.1% compared to the comparable company median of 4.5%, while ATS's adjusted EBITDA growth was 45.2%, well above the comparable company median of 7.1%. (Ex. 300 at 34, 37.) ATS's three-year revenue compound annual growth rate ("CAGR") of -1.6% was also below the comparable company median of 4.1%, and ATS's three-year adjusted EBITDA CAGR of -12.3% was below the comparable company median of 3.5%. (Ex. 300 at 34, 38.)

Bayston's selection of multiples was guided by ATS's slightly smaller size. He noted a general correlation between valuation multiples and size, and a valuation discount associated with smaller companies. (Ex. 300 at 40.) Further, he concluded that companies generating higher revenues and EBITDA growth rates are valued at higher multiples, and that ATS's lower three-year CAGR for revenue and EBITDA suggested multiples that may be below those observed for the comparable companies. (Ex. 300 at 40.) He also concluded that ATS's multiple for LTM revenue may be near the low end of the comparable companies given its lower profitability. (*Id.*)

With these factors, Bayston selected a multiple range of 5.0x to 6.0x for LTM EBITDA, which was below the median for the comparable group, 6.6x. He selected a range of 7.5x to 8.5x for projected 2007 EBITDA, which was above the comparable group median of 5.8x, to account for projected decline in EBITDA in 2007, and increase in 2008 and 2009. (Tr. 86; Ex. 300 at 41.) He selected a range of 5.0x to 6.0x for projected 2008 EBITDA, which was also above the median multiple of 5.0x for the comparable group to account for the projected increase in 2009. (Tr. 86; Ex. 300 at 41.) Finally, he selected a range of 0.30x to 0.40x for LTM revenues, which was below the median of 0.57x for the comparable group. This was based on lower historical and projected EBITDA margins relative to the comparable group (*see* Ex. 300 at 34) but accounts for long-term increases in gross margins and EBITDA margins (Ex. 300 at 41). These multiples were applied to ATS's performance, including management's revised forecasts for projected 2007 and 2008 EBITDA. Averaging the results, Bayston arrived at an enterprise value range of $181,000,000 to $220,000,000, with a midpoint of $200,500,000. (Ex. 300 at 43.)

Notz takes issue with several aspects of Bayston's analysis. First, he contends that the three largest companies selected by Bayston are not truly comparable. Giesen removed those companies, opining that they are likely to be more diversified and less vulnerable to risk than ATS because of their size and scope and ability to respond to market opportunities. (Ex. 81 at 18.) Further, if the largest companies are removed from the analysis, the median in several categories comes slightly down and ATS would be closer to the median of the comparable group. (*See* Ex. 81; Tr. 249.) For instance, if Magna and TRW are removed from the group, ATS's LTM revenue ($621 million) would come in just above the median ($552 million), as opposed to just below the median in Bayston's analysis ($770 million). (Tr. 249; Ex. 300 at 35.)

Inasmuch as removing the larger companies raises the comparable companies' enterprise value multiples, Giesen contends that the markets may be valuing smaller companies slightly higher. (Tr. 495.) With that, he asserts that Bayston's effort to account for size differences is speculative and that the premise for the adjustment—that there is a correlation between size and valuation multiple—is wrong. For instance, Notz points out that for enterprise value multiples, Magna and TRW have among the lowest multiples for LTM revenues, LTM EBITDA, and projected EBITDA (*see* Ex. 300 at 34), and that by adjusting the multiples to account for size, Bayston fails to remedy the discrepancy he targets. (Notz Trial Br. 14; Ex. 81 at 19-20.)

As noted, Giesen's approach involves deriving valuation multiples for the smaller comparable group and arranging the resulting multiples according to the minimum, first quartile, average, median, and maximum. In selecting the comparable company multiples to apply to ATS, Giesen, like Bayston, considered the relative performance and

financial condition of ATS against the comparable group. For instance, according to Giesen's report, ATS's adjusted LTM EBITDA margin of 5.9%, was below the comparable company median of 7.5% and the first quartile of 7.3%. (Ex. 81 at 19.) ATS's historical three-year EBITDA CAGR was -12.3%, compared to a comparable company median of 2.0% and first quartile of -3.3%. ATS's projected 2006-2007 EBITDA growth of -20.9% was also well below the median of the comparable group, 12.4%, and first quartile, 7.1%. ATS's projected two-year EBITDA CAGR of 4.3% was consistent with the first quartile of the comparable group, 4.1%. Acknowledging that ATS's performance was below (and in some cases well below) the first quartile on three of these four statistics, Giesen notes that ATS's debt-to-total-capital ratio of 6.2% is considerably less than the comparable company median of 39.9% and the first quartile of 38.5%. (Ex. 81 at 19; Tr. 519.) This, according to Giesen, suggests that ATS would be in a comparatively strong position to increase revenue and profitability through a combination of acquisition or capital invested in facilities and equipment. (Ex. 81 at 19.)

Giesen concluded that ATS would be valued below the median of the comparable companies, and thus applied the first quartile multiples from the group against ATS's performance for the selected metrics. The first quartile multiples arrived at by Giesen include 5.3x for LTM EBITDA, 6.1x for projected 2007 EBITDA, 4.8x for projected 2008 EBITDA, and 0.53x for LTM revenues. Giesen's application, unlike Bayston's, included management's original forecasts for projected 2007 and 2008 EBITDA. (Ex. 81 at 26-27.) Averaging the resulting figures, Giesen derived an enterprise value of $223,735,000.

The most significant gap in the selection of multiples concerns the LTM revenue multiple, wherein Bayston applied a 0.35x multiple and Giesen a 0.53x multiple (as explored during trial, this was not a simple typo). Despite the disputed methods through which they arrive, the other multiples selected by Giesen were either at or below those selected by Bayston, and the experts agree that there is not much diversity in their opinions as to those EBITDA multiples. (*See* Tr. 516.[8]) The gap revealed in the selection of the LTM revenue multiple speaks to the reasonableness of the approach taken by each expert.

As for LTM revenues, Giesen's application of the first quartile LTM revenue multiple of 0.53x against ATS's performance yields an indicated value of $328,139,000. This is a bit of an outlier inasmuch as it is well above his calculations for LTM EBITDA ($195,651,000), projected 2007 EBITDA ($178,167,000), and projected 2008 EBITDA ($192,984,000). (Ex. 81 at 26.) Giesen considered whether the LTM revenue figure was of concern given the results for the other metrics, but concluded that it was acceptable in that it was the only *revenue* multiple, and was equally weighted (25%) against each of the other indicated values (the enterprise value is the average of the indicated values for each multiple), which all reflected EBITDA. (Tr. 499-500.)

Bayston's selection of multiples did not reveal such a discrepancy, though this is not itself necessarily indicative of rightness. The midpoints of Bayston's indicated enterprise values for the valuation metrics were $203,100,000 for LTM EBITDA;

[8] However, for projected 2007 and 2008 EBITDA, Giesen ultimately calculates higher indicated values due to his use of the management's fall projections.

$188,150,000 for projected 2007 EBITDA; $194,000,000 for projected 2008 EBITDA; and $217,350,000 for LTM revenues.  (Ex. 300 at 43.)

As discussed, Bayston's calculations reflect adjustments to each range of the applicable multiples based on the size of ATS and his review of its financial performance. With regard to the LTM revenue multiple, Bayston contends that, generally, the selection of this multiple may be influenced by the relative profitability of the company.  According to Bayston, ATS is historically less profitable than many industry participants, and investors deem more profitable companies as more valuable.  (Tr. 78-79.)  To determine whether this relationship between LTM revenue multiples and relative profitability is meaningful in ATS's industry, Bayston analyzed the relationship of the comparable companies' LTM revenue and EBITDA margins.  (Tr. 81; Ex. 124; Ex. 123 at 3.)  His analysis supports the conclusion that there is an important positive relationship between LTM revenue and EBITDA margins among comparable companies.  (Tr. 83; Ex. 124; Ex. 123 at 3.)  This conclusion does not change if the largest comparable companies are removed from the analysis.  (Ex. 123 at 4.)  With that, he determined that ATS's LTM revenue multiples should be below the comparable company median, given the relatively weak profitability of ATS with respect to other industry participants.  (Tr. 84-85.)

Giesen acknowledges that there is a strong relationship between LTM revenue and EBITDA margins.  (Tr. 501-02.)  And he concedes that he did not consider this relationship in selecting the appropriate LTM revenue multiple.  (Tr. 522.)  However, Giesen contends that his approach is consistent with Bayston's inasmuch as his revenues multiple is given less weight than the three EBITDA multiples combined.  (Tr. 500.)

Even so, the substantial discrepancy in the indicated value resulting from Giesen's application of the 0.53x LTM revenue multiple from the indicated values for the other multiples is not explained away easily, and it calls into question the appropriateness of selecting the first quartile multiples across the board given this limited set of comparable companies and the performance and financial condition of ATS.

Generally, Giesen's selection of multiples was based on his belief that ATS would be valued by the market below the median, that it was appropriate to be consistent in applying one set of multiples across the board, and that the first quartile, as opposed to the minimum, was most appropriate. (Tr. 497-99.) However, as indicated earlier, ATS was well below the first quartile of comparable companies in terms of EBITDA margin and growth rate. Giesen's explanation that ATS should be afforded a range of multiples consistent with the comparable group's first quartile given that the "the balance sheet of the Company is structured in a way that promotes opportunities for additional economic growth," (Ex. 81 at 19), is not supported by the record. Giesen provides no analysis to support his belief that ATS's debt-to-total-capital ratio will result in additional investment that will yield returns higher than historical EBITDA margins or projected EBITDA margins. (Tr. 518-20.) Relatedly, Giesen can point to no analysis showing a relationship between the debt-to-total-capital ratio and selection of the LTM revenue multiple. (Tr. 521.)

As all parties acknowledge, valuation is an art, and the comparable company approach, like the DCF approach, requires multiple assumptions and subjective interpretations by the experts. Giesen's approach, while consistent and straightforward, reveals weaknesses when ATS is considered against the comparable group. As discussed earlier, Bayston points to the significant positive relationship between the EBITDA margin

and LTM revenue multiple, and compares the relative profitability of ATS with the comparable group. With this background, Bayston's adjustments to the range of multiples account for key discrepancies evidenced in the historical and projected financial performance of the group, and yield more consistent results.[9] Hence, the court adopts Bayston's comparable company analysis without adjustment.

## IV. COSTS AND FEES

The parties in this case have been at odds for years, and this appraisal action moves toward conclusion. Each contends that the other has acted "arbitrarily, vexatiously, or in bad faith." Such a finding by the court can (but need not always) result in an award of costs, attorneys fees, and other expenses. Therefore, the parties' positions are not surprising considering the substantial fees and expenses that they have incurred. Moreover, the events leading to the cash-out merger reveal significant frustration on the part of each party concerning the actions of the other. Nonetheless, for the reasons stated below, the court concludes that neither party has made a sufficient showing that the other acted arbitrarily, vexatiously, or in bad faith, and neither side is entitled to an award of fees and expenses.

Pursuant to Wis. Stat. § 180.1331(1)(a), the court in a special appraisal proceeding "shall determine all costs of the proceeding, . . . and shall assess the costs against the corporation," except as otherwise provided. The exception exists wherein the "court may assess costs against . . . the dissenter[], in amounts that the court finds to be

---

[9] Giesen's position is partially undermined by his use of the company's original forecasts in calculating projected 2007 and 2008 EBITDA, which account for 50% of the indicated values contributing to the enterprise value determination. As previously determined by this court, the spring projections more appropriately reflect management's current view of the business in terms of finances and operations, and provide the best estimate and expectations for the business going forward.

equitable, to the extent that the court finds the dissenter[] acted arbitrarily, vexatiously or not in good faith in demanding payment under § 180.1328." Wis. Stat. § 180.1331(1)(b).

Also, "the court may . . . assess the fees and expenses of counsel and experts for the respective parties, in amounts that the court finds to be equitable, . . . if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously or not in good faith with respect to the rights provided by this chapter." Wis. Stat. § 180.1331(2)(b).[10]  The language of the statute makes clear that an award of fees is a matter of discretion for the court.

The parties identify only a few cases addressing the standard for arbitrary and vexatious conduct under these circumstances, none of which interpret Wisconsin law. However, the following cases, pointed to by the parties, are informative.  In *Security State Bank, Hartley, Iowa v. Ziegeldorf*, 554 N.W.2d 884, 894 (Iowa 1996),  the Iowa Supreme Court awarded fees based on the arbitrary conduct of the company.   In that appraisal action, the court considered whether the corporation's decision to pay minority shareholders the "book value" of their shares qualified as "arbitrary, vexatious, or not in good faith" under a statute nearly identical to Wis. Stat. § 180.1331.[11]  The court defined

_____

[10] Section 180.1331(2)(a) provides that the court may assess the fees and expenses of counsel and experts for the respective parties against the corporation and in favor of the dissenter "if the court finds that the corporation did not substantially comply with §§ 180.1320 to 180.1328."  This provision is not raised by Notz, (*see* Notz Trial Br. 19), and the court finds no grounds to invoke this provision under the circumstances.

[11] The court identified the statutory language at issue:

Section 490.1331 provides for the assessment of attorney fees and expert witness expenses for either of the following: . . . b. Against either the corporation or a dissenter, in favor of any other party, if the court finds that the party against whom the fees and expenses are assessed acted arbitrarily, vexatiously, or not in good faith with respect to the rights provided in this chapter.

"arbitrary" as "an unreasoned decision made without regard to law or facts." 554 N.W.2d at 894. The record revealed that the "book value" was the *only* factor considered by the corporation in analyzing the fairness of the offer, and that all of the experts in the case concluded, among other things, an offer based on the "book value" had no basis in fact or law under the circumstances. According to the corporation's own expert, the "book value has no relationship to the fair value and that it is not a true indication of the value of the organization." *Id.*

In *Santa's Workshop v. A.B. Hirschfeld Press, Inc.*, 851 P.2d 264, 266 (Colo. App.1993), the Colorado Court of Appeals upheld the trial court's award of attorneys fees and expenses against the dissenting shareholders under the "arbitrary, vexatious, and not in good faith" standard. In that case, the court's decision was based on the following findings: (1) the shareholder "did not attempt to relate its demand to any recognizable method of stock valuation at any point in the[] proceedings"; (2) other dissenting shareholders presented reasonable demands; (3) the shareholder refused to review the corporate books and records, which had been made available; and (4) the shareholder refused to respond to the corporation's settlement proposals. 851 P.2d at 266-67. The court noted that although the statute requires only that the shareholder provide "an estimate of value," the circumstances demonstrated arbitrary and vexatious conduct by the shareholder. *Id.* at 267.

With that background, ATS contends that Notz's initial demand for payment of $21,578 per share on July 25, 2007, was grossly inflated and without analytical support.

---

554 N.W.2d at 893 (citing Iowa Code § 490.1331(2)).

ATS argues that Notz did not hire Giesen until July 13, 2007, approximately 13 days before Notz had to present his demand to ATS; that Notz failed to supply Giesen with relevant materials relating to the company's performance; and that he made no attempt to ensure Giesen understood the requirements of Wisconsin law for determining value. (ATS Trial Br. 27.) Therefore, according to ATS, Giesen's initial report was legally insufficient, inconsistent with Wisconsin law, and of no support for Notz's $21,578 per share demand. (*Id.* at 29.)

ATS further contends that the "substantial financial and business information about ATS" provided to Notz undermines any assertion that certain disputed transactions or related issues could support a valuation higher than the $11,900 reached by ATS. (*Id.* at 30.) This includes the "Information Statement for Special Meeting of Shareholders to be Held on May 17, 2007" provided to the minority shareholders on April 26, 2007. (*Id.*) As further evidence of bad faith, ATS asserts that Notz refused to engage in meaningful negotiations prior the commencement of litigation, and that he refused to turn over to ATS any information supporting his valuation demand.

In response, Notz contends that his demand was reasonable and based on Navigant's preliminary valuation report, and that it is ATS that acted arbitrarily, vexatiously, and not in good faith throughout the process. As to the latter, he contends that ATS refused to provide corporate records that were reviewed by D&P and deemed by him as necessary to a proper valuation. He further contends that ATS and Bayston acted in bad faith by developing revised forecasts to depress the fair value estimate. (Notz Trial Br. 20.)

With regard to Notz's initial demand, the record indicates that Notz was informed about the merger around April 26, 2007, and had about three weeks—the special

shareholders' meeting was set for May 17, 2007—to determine whether to dissent from the merger and exercise his rights under Wisconsin law.  During this brief period he secured legal counsel familiar with corporate transactions, and sought a valuation firm.  (Tr. 591-93.)  On May 2, 2007, Notz directed one of his attorneys to request from ATS all of the SMC's records so that he could assess the proposed merger properly.  (*See* Ex. 94.) Also, Notz wrote to Hartung requesting to review seven items identified in the D&P valuation report in preparation for the May 17, 2007 meeting.  (Ex. 94; Tr. 432.)  However, ATS denied Notz's requests for information, and referred him to the Information Statement provided to minority shareholders.  (Ex. 94; Tr. 431.)  Hartung testified that the decision to deny Notz's request for additional materials was directed by the SMC and its counsel.  (Tr. 432-33; *see also* Tr. 32-33.)  Kleinfeldt concurred that Notz was not entitled to any additional information.  (Tr. 392.)

After exercising his dissenter's rights following the merger, Notz sought a valuation firm, and engaged Navigant Consulting, in June 2007.  (Tr. 449-40, 596-97.)  Records and materials were provided by Notz to Navigant in June 2007.  (Tr. 617-18; Ex. 105.)  Giesen became involved in the Notz matter in July 2007, and was tasked to provide a preliminary valuation of Notz's interest in ATS.  (Tr. 450; Ex. 72.)  To this end, Giesen reviewed audited financial statements and records, D&P's valuation analysis, and all of the materials in the Information Statement provided by ATS.  (Tr. 450-51.)

Giesen presented his preliminary report to Notz on July 24, 2007.  (Ex. 65; Tr. 456.)  That report provided an estimated per-share valuation range of $14,370 and $16,773.  (Ex. 65 at 5.)  The report noted that the most critical variable was SG&A expenses, which increased substantially between 2001 and 2006. (Ex. 65 at 5; Tr. 458-

59.) Not knowing whether the increase in SG&A expenses was necessary, Giesen prepared an alternative model that assumed a $20 million reduction in SG&A expenses. This model yielded a fair value of equity per share midpoint of $21,578. (Ex. 65 at 10; Tr. 458.) Notz accepted this midpoint as his demand under § 180.1328, relying on Navigant's conclusions and his understanding that the company's valuation did not account for certain corporate transactions that he believed to be relevant to the issue of fair value (issues he was separately litigating in state court). (*See e.g.*, Ex. 327 at 68-69, 92, 114.)

With this background, it is difficult to conclude that Notz's demand for $21,578 was utterly arbitrary and without support. Notz is not an expert in corporate valuation or Wisconsin law regarding appraisal proceedings. For these reasons, he sought legal and financial counsel. As ATS suggests, Navigant's preliminary estimate of the per-share valuation for ATS was $14,370 to $16,773. (Ex. 65 at 5-6.) However, the unexplained substantial increases in SG&A expenses befuddled Notz and Navigant, and led Navigant to produce an alternative model assuming adjustments in SG&A expenses that drove the estimated fair value per share range up to $19,862 to $22,804. (*See* Ex. 65 at 5, 9, 10, 20.) Apparently ATS refused to provide Notz with information that could have resolved this dilemma. Indeed, Giesen abandoned his alternative assumptions regarding SG&A expenses as set forth in his July 24, 2007, report, when documents provided during discovery in this case revealed a business reason for increasing SG&A expenses. (Tr. 454, 472-73.)[12] Under such circumstances, the court does not find that Notz's initial

---

[12] In addition, the court has reviewed excerpts of Notz's deposition (Ex. 327), to which both parties point in support of their arguments. Ultimately, the many snippets of testimony that ATS points to as evidence that Notz's selection of the $21,578 figure was arbitrary are couched in Notz's explanations that he was denied access to information he deemed essential to the fair value determination. (*See e.g.*, Ex. 327 at 45-49, 115-17.) There is certainly no smoking gun in Notz's deposition testimony, nor does a review of the

demand was made "without regard to law or facts." *See Ziegeldorf*, 554 N.W.2d at 894;

*see also California DHI, Inc. v. Erasmus*, 04-CV-1566, 2008 WL 5246302, *5 (D. Colo.

Dec. 18, 2008) (noting that "the statute requires [a party] to show that the [opposing party's]

position was presented in bad faith, for vexatious purposes, or was utterly arbitrary," and

concluding that plaintiff's position was "not so bereft of a plausible factual or legal argument

that it could be said to have been interposed in bad faith or for vexatious purposes").

Moving on, the record does not sustain ATS's charge that Notz improperly

withheld relevant materials from Navigant while Navigant was rushing to put together an

initial valuation estimate. (*See* Ex. 327 at 83-85.) Though ATS has been able to pull

certain documents from Notz's apparently voluminous files that may or may not have been

provided by Notz to Giesen (*see* Ex. 327 at 105-110), this is not itself evidence of bad faith.

The record indicates that Notz provided Giesen with numerous documents that he believed

were relevant to the process, including the D&P valuation analysis and the Information

Statement, which ATS contends contains all of the necessary information. (Tr. 540-51,

618; Ex. 105.) Without more, this accusation fails.

The court roundly rejects ATS's contention that Notz's insistence that the

disputed corporate transactions were relevant to the determination of fair value is evidence

of bad faith or vexatious conduct. At issue are Notz's allegations of misconduct by ATS's

management relating to ESG's acquisition of Dickten & Masch Manufacturing Company

---

deposition leave the impression that Notz's actions under the circumstances were improperly designed to prolong litigation or force settlement (though Notz wavered on whether he believed litigation was inevitable (*see* Ex 327 at 145-46, 156)). Ultimately, Notz had to determine the appropriate figure to select as his demand pursuant to Wis. Stat. § 180.1328, and the record indicates his selection had some analytical support. The standard is arbitrary, vexatious, or bad faith—this is not met merely by showing a party *could* have done more.

("Dickten & Masch"), and ATS's sale of Trostel Specialty Elastomers Group, Inc. ("Trostel SEG") to ESG. Though this court concluded that the disputed transactions were not relevant to the question of fair value in this appraisal proceeding, this matter was litigated thoroughly as an issue of first impression under Wisconsin law. (*See* Order of March 12, 2009 (Doc. # 66).)

Relatedly, the court rejects Notz's contention that ATS and Bayston acted in bad faith by developing revised forecasts to depress the fair value estimate. (Notz Trial Br. 20.) Notz's arguments on this point parallel those presented and considered in section III(A)(1) of this decision, and for the reasons already discussed, the court finds no fault with ATS or Bayston in requesting and utilizing the updated forecasts. Further, the court declines Notz's invitation to read something sinister into Bayston's meeting with the ATS/ESG management. ATS's management oversaw budgeting and forecasting for the subsidiaries, and likely had unique knowledge of the operations of the business. (*See* Tr. 214.) Members of the SMC, knowing their fiduciary duties to the shareholders, approved of Bayston's meeting with ATS's management, and nothing in the record indicates that this was inappropriate. (*See* Tr. 383, 398.)

The rest of this dispute comes down to a game of chicken between litigious parties regarding the disclosure of documents. (*See e.g.*, Ex. 311.) Neither side wins this one. The record shows that despite repeated requests, ATS refused to provide additional information to Notz regarding ATS's corporate records that Notz believed was critical to his assessment of fair value. In turn, Notz refused to provide ATS with the Navigant report underlying his $21,578 per share demand. (Exs. 311; 327 at 142-44.) That ATS believed Notz's was requesting "a bunch of irrelevant stuff that had been fully and finally resolved,"

(*see* Tr. 444), is not evidence of Notz's bad faith or vexatious conduct. It is obvious that the parties reached the point where neither would budge, and ATS initiated this action nearly one month prior to the statutory deadline for initiating this appraisal proceeding.[13] (Tr. 443-44.) Under these circumstances, neither party's conduct qualifies as utterly arbitrary, vexatious, or in bad faith to the extent required for an award of fees and expenses. *Cf. Santa's Workshop*, 851 P.2d at 266-67.[14]

## V. CONCLUSION

In summary, the court concludes that the valuation analysis of the plaintiff, ATS, is reasonable and appropriate with regard to the determination of the fair value of ATS as of May 17, 2007. Hence, the court determines, pursuant to Wis. Stat. §§ 180.1330 and 180.1301(4), that the fair value of ATS as of May 17, 2007, was $11,900 per share. Inasmuch as this reflects the per-share amount paid on June 25, 2007, by ATS to Notz pursuant to Wis. Stat. § 180.1325, Notz is not entitled to further payment with regard to the fair value of his shares or interest in ATS under Wisconsin Statutes § 180.1330(5).

Further, the court concludes that the parties have substantially complied with Wisconsin law regarding the initiation of this appraisal action, and that neither party to this action acted arbitrarily, vexatiously, or not in good faith under Wis. Stat. §§ 180.1331(1)(b) and (2)(b). Costs shall therefore be awarded against ATS consistent with Wis. Stat. §

---

[13] Wisconsin Statutes § 180.1330 provides that the corporation shall bring a special appraisal proceeding within 60 days after receiving the payment demand under § 180.1328. Here, Notz notified ATS of his demand on July 25, 2007. The sixty-day period therefore ran through September 23, 2007. ATS initiated this action on August 23, 2007.

[14] Relatedly, no party approaches the matter with clean hands sufficient to warrant this court's discretion in awarding fees or expenses under § 180.1331(b)(2), should the factual basis for such an award exist.

180.1331(1)(a), and the parties shall bear their own fees and expenses pursuant to Wis.

Stat. § 180.1331(2).

IT IS SO ORDERED.

Dated at Milwaukee, Wisconsin, this 28th day of September, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE